GEORGE M. CHAPMAN, Executor, etc., of Eunice Chapman, deceased, Respondent, *v.* CORNELIUS W. THOMAS and JOHN A. HATT, impleaded, etc., Appellants.

PRINCIPAL AND AGENT. PARTNERSHIP; RELATION AND LIABILITIES OF PARTNERS AFTER DISSOLUTION, ETC. ASSIGNMENT FOR BENEFIT OF CREDITORS. DISTRIBUTION. OF ASSETS UNDER TERMS OF ASSIGNMENT, WHERE THE SAME HAS BEEN SUPERSEDED BY SUBSTITUTION OF ONE OF A CLASS OF PREFERRED CREDITORS. NOVATION.

The foregoing heads relate rather to topics suggested by the case, than to points determined by the court. The whole case, indeed, presents a somewhat complicated tissue of facts and incidents, which an examination of the points of counsel is essential to a fair comprehension of. The real question determined, upon which the judgment of the court is predicated, may be stated thus:

Where an assignment has been made for the benefit of creditors, which is subsequently raised, by an arrangement, whereby one of the preferred creditors, acting for himself and as the agent of another creditor, takes the place of the assignee, and purchases these preferred debts, and receives the assets assigned for their liquidation, he will not be allowed to apply. the assets first to the payment of his own claims in full, leaving his principal's claim unpaid, and thereafter seek to enforce the payment thereof from other parties alleged to be liable therefor, but must apply them to the satisfaction of all the debts provided for in the assignment, upon the basis of a *pro rata* distribution.

For incidents affecting the question of partnership liability, and the relations of principal and agent, also the novation of a debt, see points of counsel and the opinion of WOODRUFF, J.

*Joshua M. Van Cott,* for the appellants.

THIS is an appeal from a judgment of a General Term affirming a judgment on the report of a referee.

The plaintiff sought to recover ten sums of money alleged to have been loaned in 1857 to the defendants, composing the firm of Hunt, Thomas & Co., by the checks of G. M. Chapman & Co., a firm then in liquidation, composed of Eunice Chapman, and George M. Chapman, her son.

In 1857, Eunice Chapman was upward of 80 years of age; her son, as managing partner, was winding up the firm business. As he, from time to time, ascertained her share in

the balances in his hands, he, under a general authority, invested and re-invested her funds, her name not being used and she not being known as a party to the transaction. Her interest in the investments, and in the securities taken, rested in his private knowledge.

Loans were often made without its being known, at the time, whether they were of the mother's or son's funds. When the loans were ascertained to be from a balance of accounts in her favor, her initials were put upon the check margins, to identify the transaction as hers.

One ground of defense was, that the funds loaned belonged to George M. Chapman, or the firm; another was, that the loans were to Isaac L. Hunt—not his firm. The referee found both points in favor of the plaintiff, except as to two checks, one for $7,500, made in January, and one for $5,000, made in March, both of which he disallowed.

The referee, in effect, finds that the two rejected checks had been altered, by writing "For Hunt, Thomas & Co." in them, and that the entry on the margins had been fabricated for the purpose of the trial.

Hunt, Thomas & Co. was formed in April, and dissolved in December, 1857, Hunt taking the firm assets, and agreeing to pay its debts.

In May, 1858, Hunt and G. M. Chapman stated an account of all their transactions, and stated a balance of $20,880.39 against Hunt. In "performance of his obligation" to pay the firm debts, Hunt gave G. M. Chapman & Co. his note for that balance, "of all which the said George M. Chapman then and there had notice."

In November, 1859, I. L. Hunt made a general assignment to Samuel I. Hunt, making two classes of preferences. In the second class, the preference is thus expressed:

"G. M. Chapman, for balance due on I. L. Hunt's note to said Chapman, dated April 1, 1858, payable on demand, with interest, for $20,880.39, amount of which balance is not yet ascertained, he having collateral therefor, and collected some part thereof.

"G. M. Chapman, for balance of account owing to said

Chapman, which has accrued since the date of the said note of April 1, 1858, the amount of which is not yet ascertained, said Chapman holding collaterals, and collected some parts thereof, $31,865.88."

The final figures were not ascertained until March, 1860, when they were adjusted, and the account stated as due to George M. Chapman. The referee finds that the demand in suit is included in the note of May, 1858, and the settlement of March, 1860.

In March, 1860, an arrangement was made between George M. Chapman and I. L. Hunt, to raise Hunt's assignment and re-establish him in his old business, under the name of I. L. Hunt & Co., with Julia M. Chapman, the plaintiff's daughter, as a partner. Chapman agreed to " assist said Isaac in raising said assignment, and to that end shall purchase or settle all the claims mentioned in said schedules A and B, so that he will represent the same, and thereupon that said assignee shall assign to said Chapman all said assigned property, and make the the conveyances hereinafter mentioned." Another agreement was entered into between Chapman and S. L. Hunt, the assignee, in which the assignee agrees to transfer the assets to Chapman, on his producing evidence that he has purchased or paid the preferred debts, and that I. L. Hunt has arranged with the general creditors. Another agreement was made between I. L. Hunt and Julia M. Chapman, to form the firm of I. L. Hunt & Co., she contributing $40,000 to capital. It recites that she had purchased of George M., for $22,741.68, the balance of I. L. Hunt's stock of hardware, which she put in, at that valuation, as part of her capital. George took this stock under the above agreements with the Hunts. The referee finds how this arrangement was carried out, and that Hunt's assignee transferred to Chapman the assets in his hands, and conveyed to him certain property in New Jersey, which had been excepted from Hunt's assignment.

One of the appellants, C. W. Thomas, owned a preferred claim for $7,100, which Chapman induced him to sell, by a trick, at a discount of 20 per cent. The referee finds that

two-thirds of the agreed consideration remains unpaid. A condition of the sale, was the execution by Chapman of a general release. The assignment of the claim, and the release, bear even date, June 5, 1860.

So far as G. M. Chapman did not act as principal in the above transactions, they were authorized and ratified by his mother. She knew. " the arrangement made to surrender the estate into G. M. Chapman's hands; " and afterward recognized his title to the whole Chapman debt; took his personal obligation for her share of it; and also took an assignment from him of an undivided part of the consolidated debt as collateral security.

The referee finds that Chapman received the cash assets from I. L. Hunt's assignee. They amounted to $47,835.61. Chapman testified that he afterward collected $10,000, making together $57,835.61; crediting him with the sum of $22,093.93, paid to Hunt for balance due on the first class of the preferred debt, there is a balance of about $35,626.86, applicable to the second class of preferred debt. This is sufficient to pay about 75 per cent of the second class, including the demand in this suit. The referee held that Chapman was not bound to apply this surplus *pro rata* to the portion of the Chapman debt claimed by the plaintiff. He also held, that the appellants had no rights, as sureties, in the fund assigned to Samuel I. Hunt in their exoneration. .

I. The referee has found, as a fact, that the sums loaned were the moneys of Eunice Chapman, and were loaned to the firm of Hunt, Thomas & Co., of which the appellants were members. The appellants are concluded by the finding, and concede that the conclusion of law accords with the decision in *Chapman* v. *Brooks* (31 N. Y. 375).

But the amount for which the respondent has judgment is $2,927.38 in excess of the sum appearing to be due by the special findings of the referee, which accord with the evidence.

Three items, making such excess of $2,927.38, are not included in the account.

The successive settlements and arrangements by the par-

ties, as found by the referee, were all based upon and accord with that account as complete and accurate.

In stating his legal conclusion of liability for a larger sum, the referee, by inadvertence or otherwise, departed from his premise, that the account of May, 1858, was correct.

II. For the loans in question, the creditor held collaterals. The judgment in 31 N. Y. 75, is on two of those collaterals.

The loans were reduced by payments appearing in the account, and payments on the collaterals, and the balance was paid within 25 per cent by the cash assets received by G. M. Chapman from the assignee of Isaac L. Hunt. This will hereafter more fully appear under the third point.

III. Before 1863, when the action was commenced, George M. Chapman became sole creditor, and Isaac L. Hunt, the sole debtor, by a novation of the debt in question.

The following facts appear:

(*a*) Eunice Chapman and George M. Chapman composed the firm of G. M. Chapman & Co.

(*b*) In 1857, Eunice was upward of eighty years of age; and that firm was then in liquidation by George M. Chapman, the managing partner.

(*c*) Its cash assets, as realized, were deposited in the Union Bank, to the credit of G. M. Chapman & Co.

(*d*) The loans in question were from time to time made by checks drawn against that account. At about their respective dates, George would ascertain the state of the accounts between himself and mother, and then decide whether the loan should be regarded as made for himself or for her. He testifies that he in this way ascertained that the loans in question were made for her, and then placed her initials on the margin of the ten checks for identification. The referee held accordingly, except as to first and second of the series.

(*e*) Her name was not used, and the borrowers did not know her interest in the transactions; and the whole case shows that the appellants treated him as principal, while the referee holds him to have made the transactions for his mother an undisclosed principal.

(*f*) Other loans were made cotemporaneously by and for G. M. Chapman; and the account kept in the borrower's books did not discriminate these loans and the loans in suit, as made on separate accounts of the mother and son. The firm of Hunt, Thomas & Co. was formed in April, and dissolved in December, 1857; and this account, extending from March, 1857, to May, 1858, so mingling the transactions of I. L. Hunt, and Hunt, Thomas & Co., was, at the latter date, settled between George M. Chapman and I. L. Hunt, and a balance struck. The referee finds the account to be correct.

(*g*) When Hunt, Thomas & Co. dissolved, I. L. Hunt retained the firm assets and agreed to pay its debts; and when the balance was struck in May, 1858, I. L. Hunt gave his note for $20,880.39, the amount of the balance, "in performance of that obligation, of *all* which the said George M. Chapman then and there had notice." The referee finds that the checks in question are included in that note.

(*h*) George M. Chapman continued to make loans to I. L. Hunt down to November, 1859, when Hunt made a general assignment to Samuel I. Hunt, for the benefit of his creditors. In the second class, he preferred G. M. Chapman for the balance due on said note and for the indebtedness subsequently accrued. The balance on the note and the subsequent indebtedness were, in March, 1860, adjusted as a debt due George M. Chapman, at $31,488.88. Mrs. Chapman ratified the preference of her son for the balance on the note, and the subsequent adjustment of the entire debt as his.

(*i*) I. L. Hunt had thus assumed the legal position of sole debtor; had stated an account with the apparent creditor, and given him his note for the balance found due, and had assigned a large property in trust to secure its payment; and G. M. Chapman, in the same transaction, assumed the character of sole creditor.

(*j*) In March, 1860, G. M. Chapman and I. L. Hunt devised a scheme to get up I. L. Hunt's assignment, and re-establish him in his old business, with the plaintiff's daughter as copartner, under the firm name of I. L. Hunt & Co.

To accomplish this scheme, it was necessary to obtain the consent of I. L. Hunt's assignee and creditors.

Accordingly, three papers were executed, embodying the details of the scheme, viz.: The manner in which the assignee and creditors should be brought into the arrangement; when and how the trustee should transfer the assets to George M. Chapman; how the unsold hardware stock of I. L. Hunt should be transferred to the new firm, as a part of the stipulated capital of Julia M. Chapman; and in what relation George M. Chapman should stand to said assets and the Chapman claims against I. L. Hunt.

(*k*) By his ninth finding, the referee expressly connects Mrs. Chapman with this arrangement.

The evidence by which he does this is of the most conclusive character.

(*l*) G. M. Chapman having thus obtained his mother's authority "to take such steps as he thought necessary to obtain possession and control of the estate," then proceeded to perform his agreement to "pay or purchase" all the preferred debt; leaving I. L. Hunt to compromise with his creditors for all the unpreferred. On the 3d of July, he gave I. L. Hunt's assignee a statement of the claims he then held, in which the entire Chapman debt is expressed as due to him. On the 14th of July, he wrote to the assignee, that he had "purchased all the preferred claims against said estate (yours among the others), relying upon your carrying out the conditions of the said contract." Chapman testified, "I had performed my agreement as to them (the preferred creditors) to the letter." In answer to a question, whether he had paid all the preferred debts except what the assignee had previously paid, he said, "All, except what was due to himself (the assignee), for which I gave my notes and paid. That was all done before Hunt assigned to me in September."

(*m*) Hunt's assignee having thus been notified that G. M. Chapman had paid or purchased all the preferred debt, in September, 1860, assigned to him all the trust assets remaining in his hands, and other real and personal property in New Jersey, which had been excepted out of I. L. Hunt's

general assignment. He had previously transferred the stock of hardware and a large sum in cash to George M. Chapman. The hardware was taken at a cash valuation of $22,741.68, for which and for the further amount of $25,093.93, paid over to Chapman, he took Chapman's receipts. The two items amount to $47,835.61. Chapman testified, that he afterward collected $10,000; these three items making $57,835.61. When this arrangement was agreed upon, a balance of $22,093.93 was due on the first class of preferred debt; and Chapman paid that out of the sum of $57,835.61; leaving a balance of $35,626.86, applicable to the preferred debt in the second class.

The appellants insist, that that sum should have been applied *pro rata* to the preferred debt in this suit. Chapman claims, that he was not bound to apply any part of it to that debt, but might apply it to pay his own portion of the Chapman debt and the residue of the preferred debt, in full; and the referee has, in effect, so decided. In that, the referee manifestly erred.

(*n*) [Statement of account omitted.]

(*o*) The evidence of novation is completed by the agreement between G. M. C. and his mother, which recites the unity of the debt in him, and by which she takes an assignment of an undivided part of the consolidated debt as collateral to his personal contract to pay her share of the consolidated debt.

IV. George M. Chapman, having become the creditor by a novation of the debt, released the appellants, Thomas and Hatt.

In carrying out the March, 1860, arrangement, G. M. Chapman was obliged to pay or purchase a preferred claim of defendant Thomas. The sale by Thomas (at a discount of 20 per cent) was "induced" (as the referee finds) by a trick. In the letter addressed to I. L. Hunt, Chapman says: "It will do C. W. Thomas good to sweat a little about his money." I. L. Hunt testifies, that Chapman instructed him to show Thomas the letter, and endeavor to negotiate a purchase of the claim at a discount; and that Thomas finally agreed to

sell the claim at the discount, on condition of his being released. Two-thirds of the 80 per cent remain unpaid.

The assignment of the claim to Chapman and the general release are both dated June 5, 1860.

It is not denied that the appellants' liability on every thing connected with the consolidated debt of $31,488.88, is released, except the part of it now separately claimed for Mrs. Chapman. But no such exception is made in the release, or was in the contemplation of the parties.

If there was not a novation of the debt before the release, G. M. Chapman, as legatee of the demand in suit, is now estopped by his release, and the other facts found to set it up as an existing liability. He cannot assert an after acquired title in hostility to his release.

V. Partners, *inter sese*, are entitled to have the partnership property applied to pay the partnership debts. That right is not lost by a dissolution, where one partner retains the property, and agrees to pay the debts, where *bona fide* claims of third parties do not intervene, and equity will compel the application. (*Deveau* v. *Fowler*, 2 Paige, 400; *Kinney* v. *McCullough*, 1 Sandf. Ch. 370; 2 Johns. Cases, 227; *Wadington* v. *Verdenburgh*, 1 Sandf. Ch. 370.)

The 9th finding of the referee makes a case for the application of this principle.

The continuing partner performed his agreement, by assigning property to pay the firm debt, and exonerate the retiring partners. Toward that trust fund, the retiring partners stood in the relation of sureties. They had the rights of sureties to subrogation. Any interference of the creditor with the fund, and with the sureties' right to subrogation, would discharge them in this as in any other case. A release of the fund, or a postponement of its application, or a change of its application, would discharge the sureties.

It is not true, as held by the referee, that because the appellants were principals on the original contract, they could not acquire the rights of sureties in respect of a fund assigned for its payment, and that the creditor could not so affect the security as, in equity, to lose the right to hold them as prin-

cipal debtors. Where the mortgagor conveys, and the grantee agrees to pay the mortgage, the mortgagor becomes surety; the land is the primary fund to pay the debt, and a sureties' right to subrogation is acquired by the mortgagor. At law, the mortgagor remains liable on his bond, but if the mortgagee releases the mortgage, in equity the mortgagor is discharged from the debt. The release destroys the right of subrogation, and inures to the' benefit of the mortgagor in respect of the debt.

The arrangement of March, 1860, discharged the trustee, and subjected the fund to new conditions. The agreement of G. M. Chapman with the principal debtor, and the trustee of the fund, to purchase the debt, inured to the benefit of the appellants as sureties. (*Lawrence* v. *Fox*, 20 N. Y. 268; *Burr* v. *Beers*, 24 id. 178; *Dingeldein* v. *Third Avenue R. R. Co.*, 37 N. Y. 578.)

George M. Chapman, as the plaintiff's agent, and by her express procurement, having got the funds out of the trustee's hands into his own, upon his agreement to purchase the debt, if it was due to his mother, and upon his representation that he had purchased it; and having, by the like procurement as a means to the same end, purchased the appellants' debt, coupled with the condition that he would release the appellants and look to I. L. Hunt as the sole debtor, he and his mother are estopped to deny that he became the creditor and released the debt.

George M. Chapman and his mother are estopped as to I. L. Hunt and the trustee to allege that he had not purchased the debt, and that estoppel inures to the benefit of the appellants. (*The People* v. *Reeder*, 25 N. Y. 302, and cases cited.)

VI. The March, 1860, arrangement suspended all the remedies for the Chapman debt, until the estate transferred to Geo. M. Chapman is applied and exhausted.

He holds, unaccounted for, the collaterals pledged for the Chapman debt, amounting to $22,360.59 (two of which are in the judgment of this court, in 31 N. Y. 75); the balance of cash assets transferred by Hunt's assignee, applicable to

the second class of preferred debt, $35,000, and the other assets unascertained; and the large real and personal estate in New Jersey, not in the assignment, but conveyed to him by S. I. Hunt.

If the remedy is not suspended, the appellants are entitled to a *pro rata* application of the cash assets proved to be in Geo. M. Chapman's hands.

VII. It is submitted that the judgment should be reversed. If reversed on the ground of a novation and release of the debt, judgment final for the appellants, with costs, should be ordered.

*C. E. Pratt,* for the respondents.

I. Eunice Chapman unquestionably loaned the money.

1. Chapman's testimony (including check-book and memorandum of account of moneys collected and paid out for Eunice Chapman on the stumps of the checks).

2. The charges to G. M. Chapman & Co., on the books of Hunt, Thomas & Co.

And the note of Isaac L. Hunt, of May 5, 1858.

3. The bond or agreement between George M. Chapman and Eunice Chapman (put in evidence by defendants), in which is a full and formal statement of the particular loans.

II. There was no settlement of the indebtedness by the taking by George M. Chapman of the note of May 5, 1858, from Isaac L. Hunt.

1. None of the memorandum checks of Hunt, Thomas & Co., given for the loans in suit, were surrendered, and there is no evidence of any intention to recognize Isaac L. Hunt as the sole debtor. (*Van Eps* v. *Dillaye*, 6 Barb. 244; *Waydell* v. *Luer*, 3 Denio, 410; *Livingston* v. *Radcliff*, 6 Barb. 201; *Smith* v. *Rogers*, 17 Johns. 340.)

2. Although this may have been in one sense a settlement, that is, an adjustment of amount due, still, Hunt's note, within all the cases and authorities cited in the above quoted cases, was no payment or satisfaction of this claim against Hunt, Thomas & Co.

III. The transaction of the agreement of March 10, 1860, and the agreement with Isaac L. Hunt, did not operate to discharge the debt.

1. All the authority proved to have been given by Eunice Chapman to George M. Chapman was to invest her moneys as received, and secure its collection by ordinary measures, and incidentally to prevent any sacrifice of the assets of Isaac L. Hunt, even by taking the trusts of the assignment.

2. Conceding that the moneys were loaned by Eunice Chapman to Hunt, Thomas & Co., they became severally liable to her for the repayment.

As between Eunice Chapman, the creditor, and themselves, there was no application of the principles governing the relation of principal and sureties.

The fact of the partnership having been dissolved, Isaac taking the assets and assuming the liabilities, with the knowledge of the plaintiff, does not make the retiring partners liable as sureties simply.

They still remained and were primarily liable severally to Eunice.

It is confidently submitted that no case or authority is cited by the appellants' counsel to warrant the assumption of this theory, which lies at the foundation of the defense.

It would seem to be clear, upon principle, that the legal relations of the parties to the original contract could not be changed at the will of the debtors, by any transactions between themselves, no matter whether the plaintiff was informed or knew of the act or not.

The creditor could pursue her remedies at once against any and all of the debtors.

Again : The fact that G. M. Chapman, Eunice Chapman's agent, took the possession and control of the Hunt assets, neither discharged nor suspended any of the rights of Eunice Chapman.

By the agreements in evidence, it will be perceived that the transaction, shortly stated, was, that George should, at the request of the creditors and of the defendants, purchase in the debts, and represent the unpreferred creditors, and

that this should be done in six months' time (a provision for the benefit of Isaac simply, and looking to the resumption of business by him). But even if Eunice be affected by notice of all the specific details of the agreement (although, as the evidence shows, George merely had the power from Eunice to turn the Hunt assets to the best advantage, by undertaking the performance of the trusts of the assignment, and that Eunice had no notice of, and never authorized the collateral agreements between Samuel I. Hunt and Isaac L. Hunt), still, even in that case, there was no suspension or relinquishment of the claims against Hunt.

George M. Chapman was to purchase and represent the debts, not to pay and discharge them, and could at any time have enforced them by suit against Isaac L. Hunt or his partners.

By reference to the agreement with Isaac L. Hunt, it will be seen that the assigned estate was to be applied to reimburse Chapman for what he paid out in purchasing the debts.

IV. And to constitute any valid defense, this testimony as to the agreements of George M. Chapman, and his acts under the assignment, should have proved what counsel claimed before the referee it would show when it was offered (and for that purpose received), but what it has fully disproved, that G. M. Chapman had collected and had in his hands sufficient of the assets to satisfy this debt, and which equity would compel him to apply.

V. As to appropriation of payments, Chapman appropriated the prior payments to reimburse himself for all moneys paid in pursuance of his agreement with Isaac L. Hunt, of March 10, 1860, being the moneys paid out in the purchase of the claims under schedules A and B of Hunt's assignment, leaving the amount due himself and his mother to be last paid. Hence his statement, that the claim agreed to be paid in his agreement of March 10, 1860, ahead of his own and his mother's claim, amounted to between $40,000 and $50,000. It so appears by the retention of the checks in suit, by his own testimony, by the instrument in which this

debt is declared to be in existence and belonging to his mother, by his account on the stumps of the checks, by the note of May 5, 1858, and by evidence of Carlton Smith.

Chapman cannot be bound by the accounts of I. L. Hunt, the debtor. He is shown never to have seen the books until long after the payments therein credited were made.

Defendants' exhibit shows that, July 3, 1860, Chapman held claims against the estate of I. L. Hunt amounting to $76,228.29, certified as correct by Isaac L. Hunt.

As an offset to this, Samuel I. Hunt, the assignee, testifies, that he delivered to G. M. Chapman, under agreement of March 10, 1860, a stock of hardware amounting to $22,741.68, which was applied in payment of his and Noah S. Hunt's preferred claims, amounting to $22,208.75, and that the difference was afterward paid April 7, 1860. Also, that he paid Chapman $22,093.93, over and above the hardware on account. The defendants also show that $4,759.57 was collected on the collaterals. These sums are all that they pretend G. M. Chapman received from Hunt's estate; and Chapman, in answer to defendants' counsel, states that he received in realized value of Hunt's estate, about $40,000 over and above the expenses of the trust. Chapman also produced a statement of moneys received and disbursed by him. This statement the appellants have omitted from the case.

This statement showed in detail that the $10,000 which Chapman says he received after the transfer, included the $4,759.57 collected on collaterals, and the balance went to pay the expenses of the trust, including clerk hire and store rent, at the rate of $4,500 a year.

Chapman states that the moneys collected on collaterals above referred to, $4,759.57, were deducted from the specific loans they were given to secure.

It is plain, therefore, that the plaintiff's claim remains unpaid.

VI. As to the release, it purports to be the release of G. M. Chapman alone, and could not operate, of course, upon the debt due to Eunice Chapman; neither by the acts nor

conduct of either Eunice or George was it represented (as is claimed) to affect the claim in question. Before it was executed, Thomas and Hunt are both shown to have known of the fact that Eunice owned this debt.

Chapman testifies that he received no consideration for executing this release; that he had no authority whatever to release the indebtedness in suit; and that he never had any special authority to release the claims in question.

VII. There was no novation.

Mrs. Chapman did not direct Hunt to pay to George M. Chapman as the creditor; she did not receive any consideration therefor; she did not, as claimed by the appellants' counsel, purchase into or accept an assignment of an interest in the " consolidated " preferred debt. The debt was due to her, and it is submitted that a preference of George M. Chapman for a larger amount than was due him, would be void for every thing over the actual debt. George M. Chapman could only be preferred for the amount actually due him; and Mrs. Chapman was not therefore preferred at all.

By the agreement or the instrument between G. M. Chapman and his mother, of April 9, 1860, he assigned *as collateral* to her debt, a portion of the debt belonging to him; his own preferred debt.

VIII. The defendant Thomas assisted in making, and had notice of the agreements, and consented thereto.

1. The assignment of Samuel I. Hunt to G. M. Chapman was made at the request and with the consent of defendant Thomas, and had the effect as against him to rescind the assignment of Isaac L. Hunt to Samuel I. Hunt, and thus discharge the claim of the defendant Thomas, mentioned in that assignment.

2. The old assignment from Isaac L. Hunt to Samuel I. Hunt having been terminated by agreements B and O, G. M. Chapman was left free to pay the advances made by himself, in pursuance of those agreements, *first in full*, and was obliged to do so by said agreements.

3. The assignment from Samuel I. Hunt to G. M. Chapman was made by direction of all the creditors, including

those in schedules A and B of the assignment of Isaac L. Hunt to Samuel I. Hunt, defendant Thomas being included, and the same was ratified by him when he released Samuel I. Hunt, the assignee, and directed him to assign the assets to G. M. Chapman.

4. An important feature of these agreements of March 10, 1860, was the provision that all the agreements should be ratified by *all* the creditors, and that they should release Samuel I. Hunt, the assignee, from the trusts of the assignment to him, and direct him to transfer the assets to G. M. Chapman.

Samuel I. Hunt, assignee, says on page 48 : " The evidence that Mr. Chapman had performed his agreement so as to entitle him to the assignment of the assets, was the releases he presented from the creditors." He is asked by defense, " What evidence, if any, did he, Chapman, produce of his having purchased the debts named in schedules A and B ? " He answered, " He brought the releases of the parties."

This release was put in evidence with twelve other exhibits, produced on call of defendant, and suppressed by defendant.

IX. No part of the claim in suit has been paid.

1. See point V of this brief.

2. Chapman was not obliged under the agreements of March 10, 1860, and the assignment to him from Samuel I. Hunt, to apply any surplus he might have over and above enough to reimburse himself for debts paid that were included in schedule A, *pro rata*, in payment of the debts included in schedule B, as the old assignment and schedules A and B had been terminated, and he could pay himself generally all advances he had made in getting up claims.

Eunice Chapman had not been paid, and her claim in fact not being preferred, she has to look to Thomas in the first instance for her money.

3. The question of payment has been passed upon by the referee, and his finding is conclusive, there being conflicting testimony on that question.

4. The defendant should not be permitted to raise the point that the debt has been paid, as he has suppressed the evi-

dence that would establish the fact that no part of it has been paid.

5. The debts on schedule A of exhibit A, amount to $48,321.57, without including a large sum due the thirteen clerks of the firm therein mentioned.

[Statement of account, etc., omitted.]

6. It does not appear what G. M. Chapman advanced to pay and buy the claims in suhedule B; the presumption is he paid in full, and exhibit P put in by defendant, shows that as early as July 3, 1860, Isaac L. Hunt admitted that Chapman had already valid claims against the estate for debts in schedules A and B, to the amount of $76,228.35, or less claim in suit $68,093.59.

7. Samuel I. Hunt states from recollection that he realized $79,326.39 under the assignment, but the case nowhere shows what amount he passed over to G. M. Chapman, except as we have before stated. He also makes the schedules less in amount; but he states from memory eight years after he ceased to have any thing to do with the estate, and with no data before him. The schedules speak for themselves.

8. Eunice Chapman was not a party to any of the agreements between G. M. Chapman and the defendant, and the Hunts, and cannot be bound by the acts of G. M. Chapman touching the assigned estate. He was simply her agent for investing and collecting her money, and she is not proved to have had any knowledge of the transactions attempted to be set up in defense, or to have ever waived or released her claim on defendant, or given any authority to G. M. Chapman so to do.

The judgment should be affirmed.

WOODRUFF, J. My examination of this case has not been very satisfactory, but it has produced a very decided conviction that injustice has been done to the appellants.

1. In the appropriation of payments made by Isaac L. Hunt to George M. Chapman, after the dissolution of the firm of Hunt, Thomas & Co., and the retention of the assets by Hunt, upon his agreement for the payment of debts.

In my judgment, the retiring partners were entitled to claim, that payments, thereafter made by Hunt to Chapman —in general account—not specifically appropriated when the payments were made—should be applied in order of payment to the *earliest indebtedness*. This would apparently greatly reduce—not entirely extinguish—the liability of such retiring partners to the intestate, the original plaintiff. But in stating the account, the debits and credits have been, without any such appropriation, carried down successively to June, 1861, and because a balance of the whole of the transactions is, by reason of more recent charges, found due, which exceeds the amount of the plaintiff's claim, it is thereupon inferred that the whole of *her* claim is unpaid.

2. It is apparent that the referee has proceeded upon the idea, or has reached his conclusions upon the theory that Mrs. Chapman, the mother, is unaffected by the acts of George M. Chapman in the transactions after the assignment, in which he was substituted as assignee, and assumed the administration of the trusts.

He was not only her agent (if it is true that the moneys which she claims in this action were, in fact, her separate moneys), but the arrangement by which he became trustee had her assent, and as between her and the appellants, she cannot refuse to be affected by what George M. Chapman did therein. The creditors could not take the assets and the trust created by Hunt into their own hands, and administer them as they saw fit, and hold these appellants liable as original debtors, without regard to the manner in which the assigned funds were appropriated and the trust administered.

As between them and the plaintiff, property and funds coming to the hands of George M. Chapman, are to be applied, or, in equity, deemed applied, according to the equitable rights of the appellants, under the trust created by Hunt for the payment of debts, for some of which the appellants were liable.

3. It is difficult to discover what has been done with the large amount of funds traced to the hands of George M. Chapman.

I do not attempt to state an account with him, nor to prove my conclusion that the judgment should be reversed upon an attempt to charge him with the amount which apparently came to his hands, but deeming the plaintiff affected by his acts, both as her agent and trustee, I am much impressed by the testimony which bears upon this subject. The former assignee testifies (and he was not, in this, I think, contradicted), that he paid G. M. Chapman, hardware, received as cash, $22,741.68; cash and assets, received as cash, $22,093.93; and afterward, a further $3,000; making $47,835.61. Chapman states that he collected $10,000. Whether this is in addition to the other sums is not very clear. What has he done with this large amount?

The former assignee testified that he paid, under schedule A, annexed to the assignment, his own and other debts to the amount of $43,947.20. When it is observed that the whole of the debts provided for in that schedule amount, as stated in the schedule itself, to less than $50,000, it is palpable that there came to the hands of George M. Chapman a very large excess (over and beyond the balance of $7,000 or thereabouts in schedule A), directly applicable to the payment of the debts named in schedule B, among which is the debt for $31,865, claimed to include moneys due to the plaintiff; and I think it clear that, for what, under the arrangement by which he took the property, he received, which was, by the assignment, applicable to the debts in schedule B, his mother, whose agent he was, and who had assented to the arrangement, was bound (in favor of these appellants) to credit her proportionate share. In other words, whatever came to George M. Chapman's hands, which, according to the trusts in the assignment, was applicable to the debt due to the plaintiff, is to be charged to her; the receipt thereof by her son, in the relations existing between her and him and these appellants, is to be deemed a receipt thereof by herself, so far as these appellants are concerned.

Indeed, in ascertaining the amount applicable to debts in schedule B, it is to be further noticed that, under the arrangement by which G. M. Chapman was substituted in the place

of the former assignee, he was only to be paid what it cost him to purchase the debts, and not their full amount; if, therefore, he purchased the residue of the debts named in schedule A, at a discount, there would be a still increased amount received by him, applicable to the plaintiff's debts.

I call attention to these considerations, notwithstanding they seem to involve some discussion of the facts, upon the state of the proof. If it was clear that the facts thus deduced were as they present themselves to my mind, then a question of law would arise, which is within our province to consider, and I should have no hesitation in saying upon that question that the appellants were entitled to a considerable credit which has not been given them. And, although this view of the facts is not suggested as the ground of reversal, the suggestions may be useful in the further history of the case.

4. The ground upon which this judgment must be reversed is, that, if the other facts are assumed in the plaintiff's favor, it appears, that, George M. Chapman having purchased the debts unpaid in schedule A, and the debts mentioned in schedule B, the trusts created by Isaac L. Hunt's assignment, in which these appellants had a large interest, were entirely perverted, and were perverted by George M. Chapman, the agent of the plaintiff, and the trustee constituted by her assent, in the place of the former assignee.

It is not only proved, but expressly conceded by the respondent's counsel, that G. M. Chapman (instead of applying the assets received to the satisfaction of the debts provided for in the assignment, in relief of the liability of the appellants, computing, for the purpose of *pro rata* distribution, those which he purchased, at the price which he paid for them) in fact applied those assets *first* to reimburse himself *in full* for what he paid in the purchase of those debts, leaving, or attempting to leave, the claim of the plaintiff wholly unpaid, and for that whole amount it is now sought to make the appellants chargeable.

This was a plain violation of their equitable rights, and, as to them, it is no justification that in making him the substituted trustee, the other parties agreed to it.

The circumstance that they did so agree is, of itself, very strong evidence of the novation of the debt, which was insisted upon by the appellants, as proved. It tended in a high degree to show that, in the entire transactions, after Isaac L. Hunt, with the clearly proven knowledge of George M. Chapman, had assumed the payment of the debts of the firm, and especially in the arrangements by which the latter was substituted as trustee, the parties were looking solely to Isaac L. Hunt and his assets for the payment of the debts, and acted *for that reason* in the appropriation of those assets as they thought proper, without consulting the appellants or having any reference to their interest in the matter. It is difficult to explain this consistently with honesty and fair dealing, otherwise than on the ground that, at that time, they did not regard the appellants as debtors, or as having any interest in the matter.

Be this as it may, if the appellants remained liable to the plaintiff, then they had a clear right to have the assets which came to the hands of George M. Chapman, ratably applied in redemption or extinguishment of their liability, as above indicated; and, deeming the plaintiff affected by the acts of George M. Chapman, for reasons above stated, the moneys received by him, applicable to her claim, are, in favor of these appellants, to be deemed received by her.

The judgment is plainly erroneous, and a new trial must be ordered.

Judgment reversed.